**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

JOYCE ANN VANHOOSIER,

       Plaintiff,

       v.                               CAUSE NO.: 4:17-CV-84-TLS

FRANCISCAN ALLIANCE, INC. d/b/a
FRANCISCAN ST. ELIZABETH HEALTH,

       Defendant.

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 61], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court GRANTS the Defendant's motion.

**PROCEDURAL BACKGROUND**

The Plaintiff Joyce Ann VanHoosier filed an Amended Complaint [ECF No. 20] against the Defendant Franciscan Alliance, Inc. d/b/a Franciscan St. Elizabeth Health, bringing claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., and the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq. In the instant Motion for Summary Judgment, the Defendant seeks judgment in its favor on all of the Plaintiff's claims.

Under the ADA, the Plaintiff alleges (1) discrimination by the Defendant when it terminated her employment because of her disability (Counts 1–3),[1] held her to a higher standard because of her disability (Counts 4–6), treated her less favorably than similarly situated employees without disabilities when she was placed on a final written warning (Counts 10–12)

---

[1] For each alleged adverse action, the Plaintiff brings separate counts based on having a disability, being regarded as having a disability, and having a record of disability.

and placed on suspension (Counts 13–15), refused to pay her, as the full-time Director, as much as the Interim Director who replaced her during her FMLA leave (Counts 16–18), and refused to allow her to step down from her position (Counts 32–34); (2) retaliation by the Defendant for the Plaintiff complaining about discrimination that she believed violated the ADA when the Defendant failed to investigate and/or remedy her complaints of discrimination (Counts 7–9) and refused to allow her to step down from her position (Counts 35–37); and (3) a failure to accommodate her disabilities (Count 19).

Under the FMLA, the Plaintiff alleges that the Defendant (1) refused to allow her to take FMLA leave (Count 20) and (2) retaliated against her for taking FMLA leave when the Defendant held her to a higher and different standard than other similarly situated employees (Count 21), issued the final written warning (Counts 22, 23), placed her on suspension (Counts 24, 25), refused to pay her, as the full time Director, as much as the Interim Director (Counts 26, 27), terminated her employment (Counts 28, 29), and refused to allow her to step down from her position (Counts 30, 31).

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no

issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## MATERIAL FACTS[2]

### A. The Plaintiff's Employment with the Defendant

The Plaintiff began her career with the Defendant in 1987. Def. Ex. 1, ¶ 7, ECF No. 61-1. She was promoted several times while earning her degree as a Registered Nurse in 1990 and her Master of Business Administration in 2004, eventually becoming the Director of LDRP/GYNE Services in 2007. Def. Ans. to Am. Compl. ¶¶ 17–23, ECF No. 22; Def. Ex. 1, ¶ 9. In 2014, the Plaintiff's job was retitled to Director Maternal Child Services, which is the position she held until her termination on November 30, 2016. Def. Ex. 1, ¶ 9. Also in 2014, the Defendant's CEO and President Mr. Leahy, upon the recommendation of Lafayette CEO Terrence Wilson, requested that the Plaintiff complete her MBA to MHA (Master of Healthcare Administration). *See* Def. Ans. to Am. Compl. ¶ 26. In February 2016, the Plaintiff slipped and fell in the hallway,

---

[2] These facts are taken from the parties' statement of facts only to the extent they are supported by the cited evidence of record.

injuring her shoulder, and reported a worker's compensation injury. Pl. Ex. 2, 166:19–23, ECF No. 69-2.

In her twenty-nine years of service, the Plaintiff generally received very good reviews from all her supervisors and continued to advance her career. *See generally* Pl. Ex. 3, ECF Nos. 69-3, 71, 72. However, the Plaintiff's 2012 Performance Appraisal by Jacqueline Sloss, the Plaintiff's supervisor from 2007 to 2012, noted in the section "Opportunities for Growth": "Learn to communicate in an open and candid manner which respects others['] contributions without getting defensive." Def. Ex. 2, 82:1–3, 172:17–173:17, ECF No. 61-2; Def. Ex. 1, ¶ 10, Ex. A. In the 2013 Performance Appraisal, the Plaintiff's then-supervisor Deborah Riley noted that the Plaintiff needs "to make sure that she is fair and consistent with all staff" and to "[c]ontinue to work on staff respect for each other's roles and responsibilities and developing all to work together as a team." Def. Ex. 2, 59:3–7, 174:4–9; Def. Ex. 9, ¶ 8, Ex. A, ECF No. 61-9. In the 2014 Performance Appraisal, Riley noted that the Plaintiff could grow in her role as director by being more open minded with others when they make comments, suggestions, or recommendations regarding the LDRP and by working on teamwork in her department and communication with Riley. Def. Ex. 9, ¶ 9, Ex. B. Riley issued the Plaintiff a score of 2.4 out of 4.0 for "Behavioral Competencies" with a competency subscore of 2.0 for "Management Skills." Def. Ex. 9, Ex. B. A score of 3.8 to 4.0 is exemplary, 2.8 to 3.7 is outstanding, 1.6 to 2.7 is commendable, 0.4 to 1.5 is needs improvement, and 0.0 to 0.3 is unsatisfactory. *Id*.

In February 2015, Riley discussed additional performance concerns with the Plaintiff regarding following the chain of command and directed the Plaintiff that she was to "immediately stop confronting the staff about any conversations they had with [Riley]." Def. Ex. 2, 180:7–11, 184:13–16; Def. Ex. 9, ¶ 10, Ex. C. In the Plaintiff's 2015 Performance Appraisal,

Riley noted that "staff have felt their suggestions are not heard or listened to by [the Plaintiff]. When improvement opportunities are taken to Director of Nursing Operations some staff have expressed they are questioned as to why they discussed with the Director of Nursing Operations. Some staff feel there is not an environment of open collaboration to make changes." Def. Ex. 9, ¶ 11, Ex. D. Riley further noted, "[The Plaintiff] has displayed and verbalized [negativism] and resistance to looking at opportunities for improvements." Def. Ex. 9, ¶ 11, Ex. D. The Plaintiff's overall score for her "Behavioral Competencies" on this review was 1.6 out of 4.0, with a subscore of 1.2 for "Communication." Def. Ex. 9, ¶ 11, Ex. D.

In December 2015, Karen Bullard became the Plaintiff's supervisor. Def. Ex. 3, ¶ 7, ECF No. 61-3. In the Plaintiff's 2016 Performance Appraisal, which Bullard wrote at the end of January/February 2016, Bullard noted, "The concerns regarding negativity and being perceived as defensive have been addressed with [the Plaintiff]." Def. Ex. 4, 166:4–10; Def. Ex. 3, ¶ 13, Ex. A. Bullard encouraged the Plaintiff to focus "on being open to sharing [her] perspective, considering differing ideas and potential solutions to issues." Def. Ex. 3, ¶ 13, Ex. A.

## B.    FMLA Leave

In February 2016, the Plaintiff took intermittent FMLA leave to care for her mother. Def. Ex. 2, 87:6–14, 88:19–21. The Plaintiff missed as little work as possible and continued all of her duties as Director. Pl. Ex. 2, 88:22–89:8. Beginning on May 18, 2016, the Plaintiff took FMLA leave for herself. Def. Ex. 2, 90:6–22. The Plaintiff testified that she was not denied any of the FMLA leave that she requested. *Id.* at 90:17–22. On July 11, 2016, the Plaintiff told her physician she was feeling better and planned to return to work two weeks later. *Id.* at 203:9–13.

The Plaintiff agrees that Bullard was supportive of her need to take FMLA leave for her mother and herself. *Id.* at 220:2–5. During the Plaintiff's intermittent leave to care for her

mother, Bullard responded to the Plaintiff's updates with supportive affirmations. *Id.* at 214–215, 217:1–12. During her own leave, the Plaintiff texted Bullard and said, "They keep extending the date for my individual FMLA, but clearly I'm doing better myself keeping closer tabs on mom. Thanks for everything; you're a blessing to me. Hugs!" *Id.* at 217:18–24. Bullard responded: "You are very welcome. Take the time you need with your mom." *Id.* at 217:25–218:3; Def. Ex. 3, ¶ 14, Ex. B.

Sedgwick was a company used by the Defendant to administer FMLA leave and short-term disability benefits. Def. Ex. 2, 88:10–14, 92:10–14. During the Plaintiff's FMLA leave, a Sedgwick employee overseeing the Plaintiff's FMLA leave told the Plaintiff that hers was a "difficult case" and contacted the Plaintiff frequently, which the Plaintiff describes as harassment. *Id.* at 97:15–98:12. The employee told the Plaintiff that her case would be turned over to a nurse manger because the Plaintiff already had intermittent leave, and the employee called the Plaintiff's doctor's office and, with the Plaintiff's approval, spoke with the Plaintiff's counselor. *Id.* at 97:21–98:8. The Plaintiff felt like the employee was denying that the Plaintiff had a disability. Pl. Ex. 2, 100:17–19. When the Plaintiff's FMLA leave was extended, a Sedgwick employee was required to contact the Plaintiff and her provider. Def. Ex. 1, ¶ 14.

## C.    The Plaintiff's Disabilities

In her Amended Complaint, the Plaintiff alleges that she suffers from anxiety, major depressive disorder, chronic back pain, chronic shoulder pain, and hypertension, which impair the major life activities of walking, standing, thinking, concentrating, communicating, learning, communicating with others, working, eating, and sleeping. *See, e.g.*, Am. Compl. ¶¶ 37, 103. Although neither party offers evidence regarding the Plaintiff's disabilities or their effect on major life activities, the issues are not in dispute on the instant motion.

**D.      Issues Reported in the LDRP During the Plaintiff's FMLA Leave**

The Plaintiff selected Ivy Rynearson to replace her while she was on leave. Def. Ex. 2,

116:18–117:2. On July 11, 2016, Rynearson received an email from Heide Howard, a Certified

Surgical Technician in the LDRP, advising of verbal attacks and bullying by staff within the

LDPR a few weeks earlier. Def. Ex. 5, ¶¶ 8, 9, Ex. A, ECF No. 61-5; Def. Ex. 6, ¶ 6, Ex. A, ECF

No. 61-6. Rynearson shared Howard's concerns with Bullard and noted that she had similarly

felt intimidated by the employees mentioned. Def. Ex. 5, ¶ 10, Ex. A. Bullard forwarded the

messages to Shallenberger, and they spoke about the situation. Def. Ex. 10, 116:23–117:4, ECF

No. 61-10. On July 21, 2016, Rynearson received an email from another employee in the

department complaining about treatment by a coworker, which Rynearson forwarded to Bullard.

Def. Ex. 5, ¶ 11, Ex. B. On July 21, 2016, Howard sent Shallenberger an email describing

additional complaints about her coworkers and their poor treatment of other employees. Def. Ex.

6, ¶ 8, Ex. B. Based on these complaints, Shallenberger and Deana Brown, Manager Human

Resources, developed an investigation plan and interviewed additional employees between July

26, 2016, and August 1, 2016. Def. Ex. 1, ¶¶ 17, 18.

**E.      The Plaintiff's Return to Work**

On July 25, 2016, the Plaintiff returned to work from FMLA leave. Def. Ex. 4, 221:18–

21. Upon the Plaintiff's return, Bullard spoke with her, welcoming her back, informing her of the

employee interviews that were taking place, and inquiring if there had been prior concerns with

one of the employees. *Id.* at 223:9–224:15, 228:20–23.

On August 10, 2016, the Plaintiff, Bullard, Brown, and Shallenberger met to discuss the

findings of the interviews and develop a plan. Def. Ex. 1, ¶ 20; Def. Ex. 10, 136:25–137:3.

Bullard's perception was that the Plaintiff was making the situation about herself and defending

herself rather than addressing the incivility reported and creating a plan to address it. Def. Ex. 4, 234:7–235:6. One of the next steps discussed was for the Plaintiff to meet with Howard to thank her for coming forward with her concerns. Def. Ex. 1, ¶ 20; Def. Ex. 10, 137:12–18.

On August 12, 2016, the Plaintiff and Howard met; during the conversation, the Plaintiff raised issues regarding Howard's performance from years earlier as well as currently, and the Plaintiff asked Howard to sign the Plaintiff's notes of their meeting. Def. Ex. 6, ¶ 9; *see also* Def. Ex. 2, 142:2–143:16; Def. Ex. 4, 261:12–262:19. The same day, Howard reported that she left the meeting feeling that the Plaintiff was trying to make her look bad for reporting her concerns, that the Plaintiff was trying to exert power over her, and that she was in trouble. Def. Ex. 6, ¶ 10; Def. Ex. 2, 142:11–143:23.

Also on August 12, 2016, Jennifer Lohmeyer, an employee in the LDRP, met with Bullard and Shallenberger and reported that the Plaintiff approached Lohmeyer, started rubbing her shoulders, and asked if they could talk. Def. Ex. 7, ¶¶ 5, 7, ECF No. 61-7. Lohmeyer reported that the Plaintiff made her feel as if she was being coached to make positive comments about the Plaintiff, which included the Plaintiff's comments: "I better not get fired over this," "Make sure HR knows I am doing my job," and "I don't know why she [Howard] did this." *Id.* at ¶ 7. Lohmeyer reported that, given that the Plaintiff previously got mad when staff went to Riley instead of the Plaintiff with concerns, Lohmeyer was afraid the Plaintiff would be mad at her for going to Bullard with issues. *Id.* at ¶ 8.

Finally, also on August 12, 2016, there was a meeting between the Plaintiff, Rynearson, and Bullard, scheduled by Bullard in response to comments by the Plaintiff that she was being treated less favorably by Rynearson. Def. Ex. 2, 137:9–20; Def. Ex. 3, ¶ 18. During the meeting, Rynearson became emotional in response to the Plaintiff stating that Rynearson had been

excluding her. Def. Ex. 2, 137–39. Rynearson apologized to the Plaintiff, hugged her, and told

her she loved her. *Id.* at 138:17–139:10. The Plaintiff also reported to Bullard her feeling that

staff was not treating her well since returning from FMLA leave, to which Bullard suggested that

they sit down and talk with the staff to address the Plaintiff's concern. Def. Ex. 4, 385:17–22,

387:3–389:10.

At some point after the Plaintiff returned from FMLA leave, the Plaintiff's door was shut;

Bullard came to the door and told the Plaintiff to have an open-door policy because staff were

complaining about the Plaintiff isolating herself in her office. Def. Ex. 2, 130:13–22. The

Plaintiff testified, "I said I needed to have my door closed at times so I could concentrate and

focus. And oftentimes I would be in there tearful and crying. And she instructed me to have an

open-door policy." *Id.* at 130:23–131:1; *see also* Def. Ex. 3, ¶ 31. When asked if she was told to

never close her door, the Plaintiff testified that Bullard "just stated I need to have an open-door

policy" because the staff was complaining. *Id.* at 131:2–5. Bullard states in her affidavit that the

Plaintiff did not tell her that she needed to close the door because of any disability and that

Bullard did not tell the Plaintiff that she was prohibited from closing her door. Def. Ex. 3, ¶ 31.

Also after the Plaintiff returned from FMLA leave, there was a discussion in which the

Plaintiff was told not to put her hands on her hips because it was a posture of authority. Def. Ex.

2, 132:19–25. Shallenberger and the Plaintiff were discussing the Plaintiff's interactions with her

coworkers, including her tone and posture when speaking to fellow employees, and

Shallenberger gave the example of the Plaintiff standing with her hands on her hips. Def. Ex. 1,

¶ 23. The Plaintiff testified that she has back pain and was told not to place her hands on her

hips. Pl. Ex. 2, 133:1–6. The Plaintiff was not told that she cannot place her hands on her back.

Def. Ex. 2, 135:21–25; Def. Ex. 1, ¶ 23.

**F.      Rynearson's Title of "Interim Director of Nursing" and Compensation**

Upon her return on July 25, 2016, the Plaintiff learned that Rynearson had been given the title of Interim Director of Nursing during the Plaintiff's absence. Pl. Ex. 2, 117:9–118:3. The Plaintiff questioned Rynearson about the new title and corresponding badge; this made Rynearson uncomfortable. Def. Ex. 5, ¶ 12. After learning of Rynearson's new title, the Plaintiff reviewed financial reports and saw that Rynearson's pay as an Interim Director was more than hers as a Director. Def. Ex. 2, 118:7–9. On July 26, 2016, the Plaintiff requested that her pay be increased to at least what Rynearson was paid during the Plaintiff's absence. Pl. Ex. 2, 122:19–21, 124:9–18. Bullard informed her that she, like all of the Directors, was in line to get a pay raise. *Id.* at 123:9–16, 124:19–21.

Subsequently, when Rynearson wanted to work weekend shifts to make more money, the Plaintiff responded, "Well, I saw you got paid more than I did when I was off, so hopefully that helps." Def. Ex. 5, ¶ 12; Def. Ex. 2, 118:16–119:16. The Plaintiff testified that, although it was not her intention, she could understand that the statement likely made Rynearson feel uneasy. Def. Ex. 2, 120:16–25. Rynearson reported to Bullard that the conversation made her feel "very small." Def. Ex. 5, ¶ 12.

Michelle Duffy, Director of Human Resources, selected the Interim Director of Nursing title for Rynearson, instead of Interim Director of Maternal Child Health/LDRP, which would have mirrored the Plaintiff's title, because the Defendant was moving to classifying all directors in a more uniform way rather than identifying their particular area. Def. Ex. 8, ¶ 12, ECF No. 61-8. Duffy did not review the Plaintiff's title when she assigned Rynearson the Director of Nursing title and did not realize that the Plaintiff and Rynearson had different titles. *Id.* at ¶ 11. The Director of Nursing title does not dictate pay and is not a higher position than a Director

Maternal Child Services. Def. Ex. 10, 113:19–114:4, 197:9–13. Rynearson's pay was higher than the Plaintiff's because Rynearson's compensation was calculated using a pay scale based on experience that was in effect at the time for new and interim directors. Def. Ex. 8, ¶ 14; Def. Ex. 10, 178:16–179:5, 187:15–22. The Defendant was in the process of conducting a market analysis to update the compensation of all directors, including the Plaintiff. Def. Ex. 10, 185:20–186:5. On December 1, 2016, all existing directors, which would have included the Plaintiff had she been employed at that time, received a market adjustment to their compensation, increasing their compensation retroactively to October 31, 2016. Def. Ex. 8, ¶ 13.

**G.      The August 22, 2016 Final Written Warning**

On August 22, 2016, Bullard issued the Plaintiff a final written warning based on the reports from Rynearson, Howard, and Lohmeyer about the Plaintiff making them feel uncomfortable and intimidated and the Plaintiff's defensive response to the issues within her department. Def. Ex. 3, ¶ 16, Ex. D. The final written warning referenced the February 2015 performance review by Riley, the Plaintiff's former supervisor, directing the Plaintiff to stop confronting staff about conversations with the Plaintiff's supervisor, to stop talking to others about discussions related to the Plaintiff's performance, and to be open to new ideas and opportunities. *Id.* The final written warning contained "Performance Expectations" that included creating and being responsible for an environment that is collegial, professional, and supportive, being open to feedback, and increasing her self-awareness. *Id.* As part of the final written warning, Bullard requested that the Plaintiff put together a developmental plan outlining steps to improve the culture in the LDRP. Def. Ex. 3, ¶ 19, Ex. E.

Shortly thereafter, the Plaintiff told Bullard that she had felt intimidated by Bullard and Shallenberger when she received the final written warning. Def. Ex. 4, 302:6–303:4, 304:14–19.

Bullard discussed the Plaintiff's concerns with her, explained the difference between intimidation and providing difficult feedback, and expressed that it was her responsibility to set clear expectations, provide the staff with support, and hold them accountable. *Id.* at 304:21–305:11. They talked about the creation of and timeline for the developmental plan, and the Plaintiff thanked Bullard and gave her a hug. *Id.* at 305:14–306:12.

On September 2, 2016, Howard reported to Shallenberger by email that she felt the Plaintiff was trying to intimidate her and singled her out by addressing her performance issues but not those of others. Def. Ex. 6, ¶ 12, Ex. C. On September 23, 2016, Howard reported to Bullard that the Plaintiff continued to single her out and that she felt it was retaliation for raising her concerns about the department, making her wish she had not spoken up. *Id.* at ¶ 13, Ex. D.

On October 4, 2016, the Plaintiff submitted a draft of her developmental plan to Bullard, to which Bullard responded, "Good start. . . . Understanding what outcome you want to achieve will allow you to be very purposeful in your approach. . . . Keep your chin up (smiley face)." Def. Ex. 3, ¶ 19, Ex. E; Def. Ex. 2, 210:7–13. On October 14, 2016, the Plaintiff submitted a revised plan, and Bullard responded with, "Nice job. I know it is not easy. Remember, the first step always starts from within (smiley face). . . . I am proud of you." Def. Ex. 3, ¶ 19, Ex. E; Def. Ex. 2, 212:22–213:9. The same day, Bullard forwarded the revised plan to Shallenberger, with the message, "On the right track (smiley face)." Def. Ex. 3, ¶ 19, Ex. E.

## H.      Complaints from Purdue University's School of Nursing Faculty

In mid-October 2016, Bullard learned that Purdue University's School of Nursing faculty had students participating in clinicals in the LDRP who reported inappropriate and unprofessional behavior from the LDRP staff, and Bullard met with five Purdue faculty members on November 2, 2016, to discuss the issues, which included the students experiencing incivility

and hostility from the Defendant's staff. Def. Ex. 3, ¶¶ 23–24; Def. Ex. 4, 311:1–315:10. On November 3 and 10, 2016, Bullard received emails from a Purdue School of Nursing professor outlining the specific concerns the Purdue nursing faculty had with the LDRP. Def. Ex. 3, ¶ 25. The professor described a meeting between the Plaintiff and a Purdue clinical instructor on October 24, 2016, during which the Plaintiff said in a rude tone, "so YOU must be the Purdue clinical instructor," and rolled her eyes at a nurse in the room. *Id.* at ¶ 25, Ex. G. The clinical instructor said she was "immediately made to feel like [she] was five years old," the Plaintiff was nothing short of rude during the encounter, and the Plaintiff kept giving the nurse in the room "knowing looks" and shaking her head. *Id.* The nursing students reported feeling belittled by the Plaintiff and having negative experiences on the unit. *Id.*

**I.      The Plaintiff's Request to Transfer to a Different Position**

On October 31, 2016, the Plaintiff met with Bullard and asked to step down from her position as Director Labor and Delivery and Postpartum/Nursery and that she be allowed to transfer to one of the vacant Patient Care Coordinator (PCC) positions. Def. Ans. Am. Compl. ¶ 77; Pl. Ex. 2, 220:6–221:5. The Plaintiff told Bullard that she wanted to transfer to a PCC position due to stress and anxiety and had been looking for another position for a long time because her position "was not fun anymore." Def. Ex. 3, ¶ 20; Def. Ex. 2, 130:1–8, 220:6–24. The request was denied because the Plaintiff had recently been issued the final written warning and because the PCC role often fills in for the LDRP Director. Def. Ex. 3, ¶ 21, Ex. F; *see also* Def. Ex. 2, 130:9–12.

**J.      The Plaintiff's EEOC Charge and the Termination of her Employment**

On November 14, 2016, the Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commissioner (EEOC). Def. Ans. to Am. Compl. ¶ 80.

On November 15, 2016, while on paid time off, Bullard sent an email to Duffy and Shallenberger recommending that the Plaintiff be suspended pending a termination decision in light of the Plaintiff's continued lack of professionalism. Def. Ex. 3, ¶ 26, Ex. H. Bullard's email contained a copy of the November 10, 2016 email from the Purdue professor, and Bullard explained that, despite the final written warning and ongoing coaching/feedback, the Plaintiff continued to demonstrate a lack of professionalism and behaviors not in alignment with the Defendant's core values. *Id.*

On November 17, 2016, Terry Wilson, the Defendant's CEO, received a copy of the Plaintiff's EEOC charge, and Duffy received a copy of the charge on November 17, 2016. Pl. Ex. 7, ECF No. 69-7 (November 15, 2016 cover letter from the Plaintiff's counsel to the Defendant with a date stamp of "Received Nov 17 2016"); Def. Ex. D, ECF No. 84-4 (same); Def. Ex. 8, ¶ 7 (indicating that Duffy was served with a copy of the charge on November 17, 2016). Upon returning from leave on November 21, 2016, Bullard learned of the Plaintiff's EEOC charge. Def. Ex. 3, ¶ 29.

Due to the Plaintiff's tenure, it was standard practice to have a member of the Defendant's executive team review the termination decision before it was finalized. *Id.* at ¶ 28. Dr. Daniel Wickert, Vice President of Medical Affairs, was presented with the facts concerning the Plaintiff's conduct and agreed with the recommended termination. *Id.*; Def. Ex. 11, 32:9–33:5, 33:15–34:5; 38:6–9, ECF No. 61-11. The Plaintiff's termination is the only termination decision of a long-term employee that Dr. Wickert was asked to make. Def. Ex. 11, 32:9–15. He was told that he was asked because Mr. Wilson was not available to make the decision. *Id.* at 33:9–14. Dr. Wickert was not aware of the Plaintiff's EEOC Charge when he approved the Plaintiff's termination. *Id.* at 37:7–13, 38:6–9. Dr. Wickert was chosen to review the termination

recommendation because Mr. Wilson had received notice of the Plaintiff's EEOC charge. Def. Ex. 3, ¶ 29.

In a November 30, 2016 meeting, Bullard and Shallenberger notified the Plaintiff of her suspension pending termination, and presented her with the Corrective Action/Suspension Pending Termination form. Def. Ex. 3, ¶ 27, Ex. I. The notification was delayed due to Bullard and the Plaintiff being out of the office on paid time off and the Thanksgiving holiday. *Id*. The Plaintiff's employment was terminated on November 30, 2016. *See* Def. Ex. 1, ¶ 24.

On April 4, 2017, the Defendant replaced the Plaintiff with Rynearson. Def. Ans. Am. Compl. ¶ 87. During her employment with the Defendant, Rynearson took two weeks of FMLA leave in 2014 and six weeks of FMLA leave in 2015. Def. Ex. A, ¶ 7, ECF No. 84-1.

On May 15, 2017, the Plaintiff filed her second EEOC charge of discrimination and retaliation. Pl. Ex. 7.

## ANALYSIS

Moving for summary judgment on all the Plaintiff's claims, the Defendant argues that the Plaintiff was not denied any FMLA leave or reasonable accommodations under the ADA and that the Plaintiff's progressive discipline leading to termination was the result of her unprofessional conduct unrelated to her disabilities or FMLA leave. The Plaintiff responds that she was a stellar employee with a long history of positive performance reviews and it was only after learning of her need for accommodations under the ADA and her FMLA leave that the Defendant began a campaign of harassment that led to her dismissal. The Court considers the Defendant's motion as to each claim in turn, grouping the claims were appropriate.

## A.    FMLA Interference

The FMLA makes it unlawful for an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA. 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, a plaintiff must prove "that (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Guzman v. Brown County*, 884 F.3d 633, 638 (7th Cir. 2018) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). The Plaintiff alleges in Count 20 of the Amended Complaint that the Defendant refused to allow her to take FMLA leave. Yet, she testified at her deposition and acknowledges in her response brief that she was not denied any requested FMLA leave. Thus, the Plaintiff's interference claim rests solely on the argument that the Defendant harassed her while she was on FMLA leave, would not extend her FMLA leave by granting her short-term disability, and treated the Plaintiff's co-worker Rynearson more favorably. None of these grounds satisfy the Plaintiff's burden on summary judgment.

First, the Plaintiff argues that the Defendant harassed her while she was on FMLA leave when an employee of Sedgwick, the third-party administrator of the Defendant's plan, made comments to the Plaintiff about her case being "difficult" and required the Plaintiff to submit to an interview with a nurse case manager. The Plaintiff testified that she felt like the employee was argumentative and seemed to be denying that the Plaintiff really had a disability. However, the Plaintiff received all the leave FMLA she requested, and she has offered no evidence that this harassment dissuaded or prevented her from pursuing her rights under the FMLA.[3]

---

[3] In the Amended Complaint, the Plaintiff alleges that the Defendant interfered with her FMLA leave when its own employees sent her texts and called during her leave. The Defendant moved for summary

Second, the Plaintiff argues that the Defendant interfered with her FMLA leave by not extending her short-term disability insurance. However, she offers no legal support for her claim that the denial of third-party short-term disability insurance benefits is actionable under the FMLA. *Cf. Davidson v. Tyco/Healthcare*, 416 F. Supp. 2d 690, 709 (E.D. Mo. 2005) (finding that the plaintiff's claim regarding short-term disability benefits was not actionable under the FMLA as the short-term benefits were governed by the employer's employee welfare plan and independent of rights entitled to protection under the FMLA), *aff'd sub nom. Davidson v. Tyco/Healthcare Mallinckrodt, Inc.*, 205 F. App'x 469, 470 (8th Cir. 2006); *Holland v. Methodist Hosps.*, No. 2:14-CV-88, 2016 WL 5724355, at *6 (N.D. Ind. Sept. 30, 2016) (finding that the Plaintiff failed to identify a legal basis that would allow her to bring an FMLA interference claim (citing *Tarpley v. City Colls. of Chi.*, 87 F. Supp. 3d 908, 915–16 (N.D. Ill. 2015))).[4]

Third, the Plaintiff argues that the Defendant interfered with her FMLA leave by promoting Rynearson to the Plaintiff's position while the Plaintiff was on leave, asserting that Rynearson was promoted "at least in part, because [Rynearson] did not take FMLA leave even though [Rynearson] was eligible to do so." Pl. Br. 22. It is not clear how Rynearson's replacement of the Plaintiff during the Plaintiff's FMLA leave could constitute interference. The Plaintiff herself identified Rynearson as her replacement, and the Plaintiff was reinstated to her position upon her return. Moreover, Rynearson took two weeks of FMLA leave in 2014 and six

---

judgment on this ground, *see* Def. Br. 23, and the Plaintiff did not respond, waiving this basis of her interference claim. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013).

[4] Although not raised in the argument section of her brief, the Plaintiff asserts in the material facts section, without evidence, that she was "forced" to return to work on July 25, 2016. Pl. Br. 6 (citing Pl. Ex. 2, 107). However, the Plaintiff told her physician on July 11, 2016, that she was feeling better and was planning to return to work two weeks later. Def. Ex. 2, 203:9–13. The Plaintiff cites no evidence that she felt forced to return to work in relation to the FMLA leave she requested and received.

weeks of FMLA in 2015, which was prior to temporarily replacing the Plaintiff in 2016. Thus, to the extent the Plaintiff is attempting to identify Rynearson as a similarly situated employee not in her protected class who was treated more favorably, Rynearson is not a comparator because she, like the Plaintiff, took FMLA leave. *See Coleman v. Donahoe*, 667 F.3d 835, 846, 857–58 (7th Cir. 2012) (recognizing that more favorable treatment of similarly situated employees outside of the plaintiff's protected class can be evidence of pretext).

The Plaintiff also references the fact that Rynearson was paid a higher salary during and after the Plaintiff's FMLA leave. However, the undisputed evidence of record establishes that their compensation was set by established policies. Duffy selected the Interim Director of Nursing title for Rynearson during the Plaintiff's leave because the Defendant was transitioning to classifying all directors uniformly, and Duffy did not check the Plaintiff's title when selecting a title for Rynearson. The title of Interim Director of Nursing did not dictate pay, nor was it considered a higher position than the Plaintiff's title of Director Maternal Child Services. Rynearson's compensation was calculated using an experience-based pay scale in effect at the time for new and interim directors. As for the Plaintiff's pay, all existing directors, which would have included the Plaintiff had she remained employed, received a market adjustment to their compensation on December 1, 2016. The Plaintiff was advised of the anticipated market adjustment when she inquired about Rynearson's pay rate in July 2016. The Plaintiff offers no evidence that the Defendant did not follow its compensation policies as to both Rynearson and the Plaintiff or that there is any basis for a finding of pretext.

Accordingly, the Court grants summary judgment in favor of the Defendant on the Plaintiff's FMLA interference claim in Count 20.

**B.      ADA Failure to Accommodate**

Under the ADA, an employer is required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). A plaintiff bringing a failure to accommodate claim must show that (1) she was a qualified individual with a disability, (2) the employer was aware of her disability, and (3) the employer failed to reasonably accommodate her disability. *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 503 (7th Cir. 2020) (quoting *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019)). In her summary judgment response, the Plaintiff argues that the Defendant failed to accommodate her disabilities by not allowing her to step down from her position, to keep her door closed, or to place her hands on her hips. However, the Plaintiff offers no evidence to create a genuine dispute of fact that she requested and was denied a reasonable accommodation based on disability.

First, the Plaintiff argues that the Defendant did not allow her to "step down" from her Director position and transfer to a Patient Care Coordinator position. On October 31, 2016, the Plaintiff told Bullard that she had been looking for a new job for a long time because her position was "no longer fun" and that she wanted to step down due to stress and anxiety. Thus, it is unclear whether the Plaintiff communicated that her request was in relation to a disability. Regardless, the Plaintiff does not dispute that her request was denied because she was under the corrective action of the final written warning issued in August 2016 and the Patient Care Coordinator position sometimes filled in for the Director position. Thus, even if she had requested an accommodation based on disability, transferring to the position would not have

been a reasonable accommodation. *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 291–94 (7th Cir. 2015) (explaining that an employee must be qualified to perform the functions of a requested reassignment if sought as an accommodation).

Second, the Plaintiff argues that the Defendant would not allow her to keep her office door closed, which she contends was "so that her concentration would be better and to alleviate the mental stresses that she had been experiencing and of which Franciscan was aware." Pl. Br. 17–18. However, the Plaintiff offers no evidence that she asked to keep her door closed in relation to a mental disability, including mental stress. Rather, at some time after the Plaintiff returned from FMLA leave, the Plaintiff's door was shut, and Bullard told her to have an open-door policy because staff were complaining about the Plaintiff isolating herself in her office. The Plaintiff explained to Bullard that she needed to have her closed at times to concentrate and focus, and Bullard instructed her to have an "open-door policy."

Third, the Plaintiff argues that the Defendant would not allow her to place her hands on her hips despite her back pain. *See* Pl. Br. 18. However, the Plaintiff testified that she was never told that she cannot place her hands on her back, and the Plaintiff offers no evidence that she was denied an accommodation related to her back pain. Rather, during a conversation regarding the Plaintiff's interaction with staff, Shallenberger told the Plaintiff not to put her hands on her hips because it was a posture of authority. Shallenberger did not tell the Plaintiff not to put her hands on her back, and the Plaintiff offers no evidence that she communicated the need for an accommodation related to her back.

For all of these reasons, the Court grants the Defendant summary judgment on the Plaintiff's ADA failure to accommodate claim in Count 19.

**C.      ADA Discrimination and FMLA Retaliation**

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To succeed on a disability discrimination claim, a plaintiff must prove "that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)).

The FMLA makes it illegal for an employer to retaliate against an employee for taking FMLA leave. *See Freelain v. Village of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018) (citing 29 U.S.C. § 2615). To prove a retaliation claim, a plaintiff must establish that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there is a causal connection between the two. *Id.* at 901 (citing *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012)). Unlike an FMLA interference claim, a retaliation claim "requires proof of discriminatory or retaliatory intent." *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010) (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). "To succeed on a retaliation claim, the plaintiff does not need to prove that 'retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Id.* at 995 (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008)).[5]

---

[5] Although the Seventh Circuit Court has analyzed ADA and FMLA retaliation claims under the same "but for" or "because of" causation standard, it has done so without overturning *Lewis*. *See, e.g.*, *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018); *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014);

In her Amended Complaint, the Plaintiff alleges that the following employment actions constitute both discrimination under the ADA and retaliation under the FMLA: terminating her employment (Counts 1–3, 28, 29), holding her to a higher standard (Counts 4–6, 21), placing her on a final written warning (Counts 10–12, 22, 23), suspending her pending termination (Counts 13–15, 24, 25), refusing to pay her as much as the Interim Director (Counts 16–18, 26, 27), and refusing to allow her to step down from her position (Counts 30–34). The Defendant argues that the Plaintiff cannot meet her burden as to causation, offering evidence that the Plaintiff's discipline and termination were the result of her unprofessional behavior.

In response, the Plaintiff does not invoke the burden-shifting framework available under *McDonnell Douglas* but rather proceeds under *Ortiz* by arguing that "the evidence [considered as a whole] would permit a reasonable factfinder to conclude" that the Defendant took the adverse actions against her because of her disabilities and/or for taking FMLA leave. *Castetter*, 953 F.3d at 997 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under *Ortiz*, the "ultimate question" is whether a reasonable juror could conclude that the plaintiff would not have suffered the adverse action if she was not disabled or had not taken FMLA leave and everything else had remained the same. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 589 (7th Cir. 2020) (quoting *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019)). As to her claims in Counts 4–6 and 21 based on being held to a higher standard, the Court grants summary judgment in favor of the Defendant because the Plaintiff has failed to respond in support of the claims, resulting in waiver. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013). For the reasons set forth below, the Plaintiff has failed to raise a genuine issue of fact

_____

*see also Durns v. Fam. Guidance Ctrs., Inc.*, No. 19 C 4154, 2021 WL 4477919, at *7 (N.D. Ill. Sept. 29, 2021) (continuing to follow *Lewis'* "substantial or motivating factor" test).

that any of the remaining adverse actions were because of her disability or motivated by her FMLA leave.

1.      *Progressive Discipline: Final Written Warning, Suspension, Termination*

The Plaintiff argues that the adverse actions of the August 22, 2016 final written warning, her suspension pending termination, and her termination on November 30, 2016, were taken because of her disabilities and/or were motivated by her FMLA leave. However, when the evidence is viewed as a whole, no reasonable juror could conclude that the discipline and termination based on her unprofessional conduct were caused by her disabilities or motivated by her FMLA leave.

Following the Plaintiff's return from FMLA leave on July 25, 2016, a series of events occurred that led Bullard to issue the Plaintiff the final written warning on August 22, 2016. Upon the Plaintiff's return from leave, Bullard informed the Plaintiff of the employee complaints regarding coworkers in the LDRP, and Bullard brought the Plaintiff into the investigation of those complaints. Bullard perceived the Plaintiff's reaction to the investigation to be defending herself rather than addressing the problem. After the Plaintiff met with Howard to thank her for coming forward with her concerns, Howard reported to Bullard that she left the meeting feeling like the Plaintiff was trying to make Howard look bad for reporting her concerns. Rynearson, who had served as Interim Director during the Plaintiff's leave, reported to Bullard that the Plaintiff made her feel uncomfortable when Rynearson wanted to work weekend shifts to make more money and the Plaintiff commented, "Well, I saw you got paid more than I did when I was off, so hopefully that helps." On August 12, 2016, Lohmeyer reported that she felt the Plaintiff was intimidating her to making positive comments to human resources about the Plaintiff and to not report issues to Bullard. As a result of the reports from Howard, Rynearson, and Lohmeyer,

Bullard issued the Plaintiff the final written warning on August 22, 2016, and requested that the Plaintiff create a developmental plan outlining steps to improve the culture in the LDRP.

Subsequently, on September 2, 2016, Howard reported that the Plaintiff was trying to intimidate her and was singling her out by addressing her performance issues but not those of others, and, on September 23, 2016, Howard reported that she felt the Plaintiff was retaliating against her for raising her concerns about the LDRP. Then, in mid-October 2016, Bullard learned that Purdue University School of Nursing students doing clinicals in the LDRP were having difficulties with the staff. On November 2, 2016, Bullard met with five faculty members and learned that the students were experiencing incivility and hostility in the LDRP. On November 3 and 10, 2016, Bullard received emails from a Purdue faculty member outlining specific concerns, including that the Plaintiff was rude to a Purdue clinical instructor on October 24, 2016, and that the nursing students felt belittled by the Plaintiff. Regarding the October 24, 2016 incident, a clinical instructor reported that the Plaintiff said, "so YOU must be the Purdue clinical instructor" and rolled her eyes at a nurse in the room, which made the instructor feel like a child. The instructor also reported that the Plaintiff kept giving the nurse in the room "knowing looks" and shaking her head.

Following these reports from the Purdue faculty, on November 15, 2016, Bullard recommended that the Plaintiff's employment be terminated. Bullard's recommendation, sent by email, included a copy of the November 10, 2016 email from the Purdue faculty member and explained that Bullard no longer felt confident that the Plaintiff could be successful in her role. Bullard wrote that, despite the final written warning and ongoing coaching and feedback, the Plaintiff continued to demonstrate a lack of professionalism and behaviors not in alignment with

24

the Defendant's core values. The Plaintiff was notified of the decision on November 30, 2016, which was the date her employment was terminated.

The Plaintiff responds that the Defendant's purported reasons for the discipline and termination are a pretext for discrimination and retaliation and that the timing of the events is suspicious. *See Sandefur v. Dart*, 979 F.3d 1145, 1155 (7th Cir. 2020) (explaining that the issue of "pretext" is relevant when considering the evidence as a whole under *Ortiz*). In assessing pretext, a court does "not evaluate whether the stated reason 'was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain'" the adverse action. *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (citation omitted); *see also Castetter*, 953 F.3d at 997 ("The only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs." (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006))). "A pretextual decision, then, 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Harden*, 799 F.3d at 864 (citation omitted). To meet the burden of showing that the employer's reason was pretextual, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's stated reason "that a reasonable person could find [it] unworthy of credence." *Id.* at 865 (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)). The Court considers each of the Plaintiff's three pretext arguments in turn.

First, the Plaintiff argues that she was a "stellar" employee until she asserted her statutory rights under the ADA and the FMLA. Although she is correct—and the Defendant does not dispute—that her employment history contains largely positive performance reviews, high scores, and promotions over the years, the Plaintiff fails to acknowledge that her record since

2012 shows that she was counseled regarding her conduct in relation to other employees by two prior supervisors as well as Bullard, her current supervisor. The Defendant points to the performance reviews containing comments that the Plaintiff needed to learn to communicate openly and candidly to respect others' contributions without becoming defensive; to be fair and consistent with all staff; to be open minded as to others' comments, suggestions, and recommendations; to work on teamwork in her department; to work on communication with her supervisor; and to stop confronting staff about conversations they had with the Plaintiff's supervisor. Her prior supervisor noted that some staff feel there is not an environment of open collaboration to make change and that the Plaintiff had displayed negativism and resistance to opportunities for improvement. When Bullard became the Plaintiff's supervisor in December 2015, she found similar issues regarding the Plaintiff's performance. Thus, the concerns raised by two prior supervisors beginning in 2012 are similar to the issues raised by Howard, Rynearson, and Lohmeyer in July and August 2016, which led to the final written warning. And, the final written warning specifically referenced the prior supervisor's February 2015 performance review. *Id.* The supervisors' concerns are also consistent with those articulated by the Purdue nursing instructors in October and November 2016, which, in light of the final written warning, led to the Plaintiff's suspension and the termination of her employment.

Although the Plaintiff disagrees with how the Defendant handled the investigation of the employee reports and disagrees with the basis of the August 22, 2016 final written warning, she offers no evidence to question the fact that the reports were made or that Bullard did not honestly believe that the events occurred as described. For example, in a footnote the Plaintiff argues that the Defendant should not have "sided" with Howard, suggesting that the Defendant made an "unfair" decision. The Plaintiff also argues that Bullard should have interpreted the Plaintiff's

reaction to being confronted differently and that there is a question of fact about the tone Bullard

used when speaking with the Plaintiff that led to her defensive reaction. *See* Pl. Br. 16, n.5.

Similarly, the Plaintiff contends that it is unreasonable that the Defendant disciplined her and

terminated her employment based on unprofessional behavior in light of her overall positive

performance reviews over the years. But it is not enough that the Plaintiff disagrees with the

Defendant's perception of her performance or how her discipline was handled. "A court is not a

'super personnel department that second-guesses employers' business judgments.'" *Riley v.

Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d

1169, 1181 (7th Cir. 2002)). The Plaintiff has offered no evidence that the Defendant did not

honestly believe the reasons for the final written warning or her termination, that the reasons

were insufficient or implausible, or that there were contradictions in the Defendant's reason such

that a reasonable person would not believe the explanation.

Second, the Plaintiff attempts to downplay the significance of the reports from the Purdue

nursing instructors by describing the incident as nothing more than an isolated "eye roll." *See* Pl.

Br. 15.[6] She also argues that she had excellent relationships with others and submits what appear

to be favorable notes and messages from other nursing students and instructors sent to the

Plaintiff. *See* Pl. Ex. 10, ECF No. 69-10. However, it is undisputed that, on November 2, 2016,

Bullard met with five faculty members from Purdue University's School of Nursing, who

reported that students going through clinicals at the LDRP had been treated with incivility and

hostility by the LDRP staff. It is also undisputed that, on November 3 and 10, 2016, Bullard

received emails from a Purdue faculty member detailing the Plaintiff treating a Purdue clinical

---

[6] The Court disregards the unsupported factual statements in the Plaintiff's brief regarding the nature of
her interaction with the Purdue nursing students and staff. *See* Pl. Br. 16. An attorney's statements or
arguments in the brief are not evidence. *See Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015); *In re
Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985).

instructor rudely on October 24, 2016, and reports by nursing students that they felt belittled by the Plaintiff. Any dispute regarding the nature of the underlying interactions with the Purdue faculty and nursing students has no bearing on causation, as the relevant inquiry is whether the incidents as reported by the Purdue faculty to Bullard were the real reason for the Defendant's decision to terminate the Plaintiff while the Plaintiff was under the discipline of the final written warning. The Plaintiff has offered no evidence to the contrary. To find that the Defendant's reliance on these events was a pretext for discrimination or retaliation, the factfinder would have to ignore the timing as well as possibly conclude that the Purdue faculty was somehow colluding with the Defendant to discriminate against the Plaintiff.

Finally, the Plaintiff argues the Defendant's failure to accommodate her disabilities supports a finding that the reason for her termination was pretextual. However, for the reasons set forth in detail above, the Plaintiff has not shown that she requested accommodations for her disabilities or that the Defendant failed to reasonably accommodate her disabilities.

In addition to pretext, the Plaintiff argues suspicious timing, noting that the Defendant's "firing of [the Plaintiff] was only a few days after she filed her EEOC charge of discrimination . . . , especially since she had been an exemplary employee for years and given the fact that she had been placed on a final written warning three months beforehand." Pl. Br. 18. Although suspicious timing is rarely enough, presentation of suspicious timing and pretext may defeat summary judgment. *Riley v. City of Kokomo*, 909 F.3d 182, 188–89 (7th Cir. 2018) (citation omitted); *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 505–06 (7th Cir. 2017). Here, the Plaintiff has demonstrated neither.

First, the undisputed evidence is that Bullard recommended the Plaintiff's termination on November 15, 2016, before she or anyone else at the Defendant was notified of the EEOC

charge, which was, at the earliest, November 17, 2016. Second, the Plaintiff contends that the Defendant waited three months after the final written warning on August 22, 2016, before terminating her employment. Yet the Plaintiff fails to acknowledge that, during the months following the final written warning, Bullard was working with the Plaintiff to improve the issues in the LDRP through the developmental plan. The Plaintiff also fails to acknowledge that, after receiving a complaint in late October, Bullard met with five Purdue faculty members on November 2, 2016, regarding nursing students experiencing hostility and incivility in the LDRP, and, on November 3 and 10, 2016, Bullard received emails from Purdue instructors describing the Plaintiff's unprofessional conduct toward faculty and students. In this full context, the Plaintiff has failed to demonstrate suspicious timing.

Thus, the Plaintiff has failed to establish causation because, viewing the undisputed evidence as a whole, no reasonable factfinder could conclude that the Plaintiff's final written warning, suspension, and termination were because of disability discrimination or motivated by FMLA retaliation. The Court grants summary judgment in favor of the Defendant on the ADA discrimination and FMLA retaliation claims in Counts 1–3, 10–15, 22–25, 28, and 29.[7]

---

[7] Although the Plaintiff's response brief contains a section referring to her "hostile work environment" claims, *see* Pl. Br. 19, the Court understands the arguments to be made in support of her claims of discrimination, retaliation, and interference. Even if the Plaintiff had brought a hostile work environment claim, summary judgment would be granted for the Defendant on the same basis that the Plaintiff has offered no evidence that the adverse actions, if they can be deemed harassment, were based on her disability. *See Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021) ("To succeed on a hostile work environment claim, a plaintiff must show: (1) unwelcome harassment; (2) *based on a protected characteristic*; (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) a basis for employer liability." (emphasis added)). In addition, the Plaintiff offers no evidence in support of her assertion that she was the target of a "whisper campaign." Pl. Br. 19.

2.    *Compensation*

The Plaintiff also alleges disability discrimination and FMLA retaliation when the Defendant paid Rynearson more as Interim Director during the Plaintiff's FMLA leave than it paid the Plaintiff as Director. As discussed in detail above in the context of the Plaintiff's FMLA interference claim, the undisputed evidence establishes that Rynearson's and the Plaintiff's compensation were set by established policies. The Plaintiff offers no evidence of pretext. Thus, the Court grants summary judgment in favor of the Defendant on Counts 16–18, 26, and 27.

3.    *Request to Step Down as Director to Become a Patient Care Coordinator*

Finally, the Plaintiff argues that the Defendant's denial of her request on October 31, 2016 to allow her to step down from her Director position to a Patient Care Coordinator position was discrimination based on her disabilities and/or retaliation for taking FMLA leave. However, as discussed above in the context of her ADA failure to accommodate claim, the undisputed evidence is that her request was denied because she had been given the final written warning and the Patient Care Coordinator sometimes fills in for the Director. The Plaintiff has offered no evidence to connect the denial of her request to either her disabilities or having taken FMLA leave. The Court grants summary judgment for the Defendant on Counts 30–34.

**D.    ADA Retaliation**

It is unlawful for an employer to retaliate against an employee who asserts her rights under the ADA. 42 U.S.C. § 12203(a). To prove an ADA retaliation claim, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse action, and (3) there is a causal connection between the two. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018) (citing *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015)). Protected activities under the ADA include seeking an accommodation or by asserting a

claim of discrimination due to disability. *Id.* (citing *Preddie*, 799 F.3d at 814–15). As with the ADA discrimination claim, the causation element requires a plaintiff to show but-for causation, meaning that the defendant would not have taken the adverse action if the plaintiff had not engaged in the protected activity. *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

In her ADA retaliation claims in the Amended Complaint, the Plaintiff alleges that she complained about disability discrimination to the Defendant and that the Defendant retaliated by failing to investigate or remedy those complaints (Counts 7–9) and by not letting her step down from her position as Director to a Patient Care Coordinator position (Counts 35–37). The Plaintiff also argues in her response brief that her employment was terminated in retaliation for filing her charge of discrimination with EEOC. The Plaintiff's ADA retaliation claims, like her discrimination claims, fail on the causation element.

First, the only evidence of alleged complaints of discrimination is related to the Plaintiff's complaints that Rynearson received higher pay as Interim Director than the Plaintiff received as Director. Pl. Br. 7. Yet, there are no facts showing that the Plaintiff complained to the Defendant that she believed she was not paid as much as Rynearson *because of* her disability. This complaint, unrelated to her disability, cannot constitute protected conduct that would form the basis of an ADA retaliation claim. *See Orton-Bell v. Indiana*, 759 F.3d 768, 776 (7th Cir. 2014) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." (citation omitted)).[8] As to her allegation that the Defendant failed to investigate the

---

[8] Although the fact section of her brief asserts that the Plaintiff complained "that she was being discriminated against and was being retaliated against for taking leave to take care of her herself and her mother," Pl. Br. 7, none of the cited portions of her deposition support this factual assertion.

pay disparity, Bullard told the Plaintiff in the same conversation that all Directors, including the Plaintiff, would be receiving an adjustment to their compensation.

Also, the Plaintiff has offered no evidence connecting her complaints in July 2016 about Rynearson's higher pay to the denial of her request in late October 2016 to step down from her position as Director to a position as Patient Care Coordinator. Again, the Defendant denied the request because the Plaintiff had been given the final written warning and because the Patient Care Coordinator position sometimes fills in for the Director position. The Plaintiff has offered no evidence that this was not the true reason for denying the Plaintiff's request.

As for the Plaintiff's assertion of retaliatory termination for filing the EEOC charge, the undisputed evidence again shows that Bullard recommended the Plaintiff's termination on November 15, 2016, before anyone at the Defendant was informed of the Plaintiff's EEOC charge, which was, at the earliest, on November 17, 2016. Bullard did not learn of the EEOC charge until November 21, 2016. Moreover, as discussed above, the Plaintiff has failed to offer evidence to show that the Defendant's reason for terminating her employment based on the complaints from the Purdue faculty after the Plaintiff had received the final written warning was a pretext for discrimination.

Accordingly, the Court grants summary judgment in favor of the Defendant on the Plaintiff's ADA retaliation claims in Counts 7–9 and 35–37, including any claim of retaliatory termination based on the filing of the November 2016 EEOC charge.[9]

---

[9] The *titles* of Counts 4–18, which only contain factual allegations of discrimination, contain the word "retaliation." Out of an abundance of caution, the Defendant moves for summary judgment on any ADA retaliation claims in Counts 4–18. For the same reasons that the ADA discrimination claims in those counts fail on the causation element, any ADA retaliation claims based on the adverse actions of the final written warning, suspension, termination, and being paid less also fail on the causation element.

**CONCLUSION**

For the reasons set forth above, the Court hereby GRANTS the Defendant's Motion for Summary Judgment [ECF No. 61]. The Court DIRECTS the Clerk of Court to enter judgment in favor of the Defendant Franciscan Alliance, Inc. d/b/a Franciscan St. Elizabeth Health and against the Plaintiff Joyce Ann VanHoosier.

SO ORDERED on January 7, 2022.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT